Filed 8/14/26  P. v. Harris CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHAWN MICHAEL HARRIS,<br><br>    Defendant and Appellant. | B337523<br><br>(Los Angeles County<br>Super. Ct. No. NA116513) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and Seth P. McCutcheon, Deputy Attorney General, for Plaintiff and Respondent.

————————————————

Shawn Michael Harris appeals from the judgment of conviction after a jury found him guilty of multiple sexual offenses committed against his former fiancée, Angela L., and her daughter, Lindsey. Harris was convicted of one count of rape, two counts of forcible sodomy, one count of lewd act upon a child under the age of 14, and one count of continuous sexual abuse of a child under the age of 14. The jury also found the allegations true that Harris committed lewd acts against multiple victims and that he had committed a prior offense of forcible oral copulation.

On appeal, Harris contends the trial court violated his constitutional right to equal protection by refusing to provide him with pretrial and trial transcripts despite his indigency. He also contends the court abused its discretion by excluding three exhibits and precluding his mother from testifying at trial. Finally, Harris contends the court erred by failing to instruct the jury with one of the factors enumerated in CALCRIM No. 266. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution Case*
    1.    *Harris's relationship with Angela*
Angela and Harris began dating in 2014, and in 2015 they became engaged. In 2016 Harris, Angela, and Lindsey moved into an apartment in Long Beach, California. Angela and Harris shared one bedroom; Lindsey had her own bedroom.

2.      *Sexual abuse of Lindsey*

Lindsey, who was 18 years old at the time of the trial (in 2024), testified that one morning in November 2016, when she was 11 years old, Harris entered her room, reached under her nightgown, and put his hand on her vagina over her underwear. Lindsey pretended to be asleep, then after a few seconds she acted like she was waking up, and he stopped. A few months later, Harris entered Lindsey's room, led her to her bed, and grinded his erect penis against her vagina. When Lindsey started crying, Harris stopped.

Lindsey recounted multiple other occasions from 2017 to 2019 when Harris sexually abused her in the family home. On one occasion Harris pushed her against the wall, lifted her up, and grinded his erect penis against her vagina. On another occasion, Harris wrapped Lindsey in a blanket, carried her into Angela's room, laid her on the bed, and grinded his erect penis against her vagina. On a third occasion, Harris pushed Lindsey down on a couch and grinded his erect penis against her while she was face down. The last time Harris abused Lindsey was in late 2019 when Harris pushed up against her from behind as she was reaching into the refrigerator, and he grinded against her. Lindsey recalled Harris abusing her more than twice on the living room couch, and she estimated Harris had grinded his penis against her buttocks or vagina 15 to 20 times from the time she was 11 years old until she was 14 years old. Lindsey did not tell anyone because they did not have sex, and she did not know if it would "count."

3

3.    *Sexual abuse of Angela L.*

Angela testified that in 2019 they ended their relationship. Angela told Harris she no longer wanted to be intimate with him, and she began sleeping on a reclining chair in the living room instead of in their shared bedroom.

One day in February 2021, Harris told Angela that something was happening outside of the apartment, so Angela went to look out of Harris's bedroom window. When Angela realized nothing was going on outside, she turned to leave the room, but Harris grabbed her and threw her on the bed. Angela tried to pull herself away from Harris and told him, "'No. Leave me alone. Let me go. Get off me.'" Harris said he did not want to stop, and he proceeded to rape and sodomize Angela.

On the evening of February 28, 2021, Angela was lying in the living room reclining chair when Harris entered the room, sat in the chair in front of her, and began "fondling" her under the blankets. Angela asked him to leave her alone, but Harris pulled his penis out and "fondled" himself. Despite Angela's protests, Harris grabbed her wrists, lifted her from the chair, and placed her face down on the floor. Harris pulled Angela's underwear down and put his penis in her vagina, which caused her pain. As he was doing this, Angela said, "No, I don't want to . . . . Leave me alone."

Harris stopped when Lindsey opened her bedroom door to get something from the living room, and she asked Angela what was going on. Angela did not want to tell Lindsey what was happening, so she told Lindsey that Harris had been crying because he was considering moving to Texas but he did not want to go. Lindsey testified that she recalled hearing a noise from the living room after she left the bathroom, but Angela told her that

4

she was in the living room with Harris and to go back to her room. Lindsey did not see Harris and did not hear any screams or cries from the living room.

After Lindsey left, Harris moved Angela to the floor, and Angela told him, "No. Just leave me alone." Harris then penetrated her vagina with his penis repeatedly, penetrated her anus, ejaculated on her back, and wiped her back off with "some tissue." After the assault ended, Harris left the room, and Angela sat back in the reclining chair, bleeding and in pain.

Angela estimated that Harris forced sexual acts on her approximately 10 times since they broke up.

4. *Reporting of the sexual abuse, the SART exam, and DNA testing*

On the morning of March 1, Angela called a rape hotline while Harris was away from the apartment returning a vehicle he had rented. While Angela was on the phone, Lindsey approached her, and Angela disclosed that Harris had been raping her. Lindsey went to the bathroom and cried, and when she came out, Angela asked her why she was crying and whether Harris had touched her. Lindsey said, "Yes." Angela then called 911. Angela did not recall what time she had called the rape hotline or when she placed the 911 call. Long Beach Police Detective Rodolfo Rodriguez, one of the officers who responded to the 911 call, testified that, according to his report, Angela called the rape hotline in the morning and the 911 call occurred at 6:45 p.m.

Long Beach Police Detective Mary Marschke came to the apartment with other officers at approximately 6:28 p.m. Angela and Lindsey gave statements to the officers, and then Detective

5

Marschke and her partner transported Angela and Lindsey to the hospital. Detective Marschke described Angela as being "scared" and "hesitant" in reporting; Lindsey was "very upset" and "really struggling." Detective Marschke was wearing a body camera (bodycam) that recorded the interviews. The camera was set to Coordinated Universal Time (UTC), which was eight hours ahead of Pacific Standard Time.

At the hospital, Angela and Lindsey gave statements to Detective Rodriguez and his partner, and Angela was examined that night by Jennifer Rivera, a sexual assault response team (SART) nurse. Rivera found red abrasions on Angela's right knee, superficial abrasions on the base of her vaginal opening, and multiple anal lacerations consistent with forcible sodomy. Rivera also collected samples from multiple areas on Angela's body, including her cervix.

Long Beach Police Detective Vincent Kong testified that he was present when Harris voluntarily provided a DNA sample to the police on March 2, 2021. On cross-examination, he acknowledged that Harris told him that he had a shoulder injury, and in response Detective Kong put multiple handcuffs on him to make him more comfortable.

Jessie Pettet, a criminalist with the Los Angeles County Sheriff's Department, analyzed samples collected from Angela's SART exam, Harris's DNA sample, and "a set of crinkled up blue paper napkins" included in the police case file. Pettet's analysis revealed the presence of Harris's DNA in the cervical sample from Angela's SART exam and in semen detected on the blue

6

napkins.  On cross-examination, Pettet confirmed there was no other DNA contributor detected in the napkin sample.[1]

     5.     *Crystal H.'s testimony about Harris's prior sexual assaults*[2]

Crystal H., Harris's ex-wife, testified that on March 28, 2008 she returned home from work after fighting with Harris all week, and Harris insisted that he or Crystal move out of their house.  Crystal volunteered to leave and went to the bedroom to change her clothes and decompress.  While Crystal was reading in bed, Harris entered the room, demanded oral sex, and began pulling the blankets from the bed despite Crystal's protests.  Crystal begged Harris to let her go to the bathroom first, which he allowed, and on her way back to the bedroom, Crystal activated an audio cassette recorder hidden in her underwear drawer.  Harris then jumped over the end of the bed, grabbed Crystal by the arm, and pulled her back to the bed.  Harris forced his penis into Crystal's mouth and put his hands around her neck to choke her.  Harris then vaginally raped her.  Portions of the audio recording of the assault were played for the jury, in which Crystal said, "I'm choking.  I'm choking."  Four days later they got into another argument, and Harris again choked her, but this time Crystal started to black out.  Harris hit her in the head twice and, as she pleaded for him to stop, anally raped her.  That

---

[1]     Although there was no testimony about the blue napkins, in his closing argument Harris described the blue napkins as the "tissue" that Angela claimed he had used to clean Harris's ejaculation from her back during the February 28 assault.

[2]     The testimony was admitted pursuant to Evidence Code section 1108.

night Crystal snuck out of the house and called the police, who came to the house and arrested Harris.

B.    *The Defense Case*

Harris represented himself at trial.  He testified that he never abused Angela or Lindsey.  Harris met Angela after his May 2014 release from prison, and they were engaged by January 2015.  In September 2019 Harris, Angela, and Lindsey moved in together.  Harris informed his parole officer that they had gotten married, and his parole officers conducted monthly checks of the apartment and asked Angela and Lindsey how they were doing.  Shortly after they moved in together, Harris obtained permission from his parole officer's supervisor to attend a father-daughter banquet at Lindsey's school, and the event went well.  Harris testified, "Angela and Lindsey were very happy with me.  And I regularly took pictures of my family life, because it was something I was proud of."  Harris sought to introduce 15 photographs of the family, but the trial court sustained the prosecutor's objection to admission of the photographs.

In November 2020 Harris, Angela, and Lindsey decided to move to Odessa, Texas, where Harris could get a higher paying job and they could live more cheaply.  On February 7, 2021 Harris reserved a cargo van for him to pick up on February 26, and on February 15 he provided notice to their landlord of their intent to vacate the apartment.  On February 20, however, Harris injured his hip, shoulder, and back while he was attempting to move a 300-pound treadmill out of their apartment in preparation for the move.  Harris went to the chiropractor on February 21 and three more times over the next nine days.

Harris marked an email from a chiropractic club as an exhibit, although the trial court later sustained a hearsay objection to the exhibit.

On February 26 Harris went to the rental location with Angela to pick up the cargo van. Angela left to run errands, and Harris returned to the apartment and loaded the van. At around 9:00 or 10:00 a.m. Harris left by himself in the van to drive to Texas. He arrived in Texas on February 27, and he loaded everything from the van into storage. He talked to Angela that evening from his hotel room. Early the next morning Harris drove back to Los Angeles and returned to their apartment at 10:00 or 11:00 p.m. Angela was asleep on the reclining chair. He kissed her and went to sleep in his bedroom. He woke up at 4:00 a.m. and masturbated "out of habit," cleaned himself with the blue napkins they kept in the house, threw the napkins in the trash, and went back to sleep.

Harris woke up around 7:00 a.m. (on March 1) to return the cargo van. Angela was still asleep in the reclining chair, and he kissed her on his way out. After he returned the van, he used the Uber application to get a ride to the apartment. Harris marked as an exhibit a document he described as his "Uber receipt on March 1st, at 8:40 a.m." According to Harris, he arrived back at the apartment at 8:14 a.m.[3] He kissed Angela again, then made breakfast for the two of them while Lindsey slept. After breakfast, Harris iced his back in his bedroom and at around 10:30 a.m. walked Angela to her car so she could run errands. When Harris returned to the apartment, Lindsey was awake

---

[3]     Harris did not explain how the 8:39 a.m. receipt (that he described as the 8:40 receipt) showed he was in the apartment at 8:14.

9

attending school remotely. At 11:30 a.m. Harris left to run errands; he ate lunch out and returned around 2:00 p.m.

After Harris returned, he emailed his boss two weeks' notice of his resignation. Around 3:30 p.m., Harris and Angela got into an argument after Angela told him she did not want to go to Texas. She said that she wanted Harris to give her the Dodge Dart that she had owned with a man named Raymond. The two continued to argue, and Harris left the apartment around 5:45 p.m. and went to a friend's house. The next morning Harris went to a storage facility where the Dodge Dart was kept and drove it to another friend's house. Harris was arrested later that day when he drove to the Long Beach Police Department to report his change in residence.

Harris explained that he spent six years in prison as a result of Crystal's accusations but he "maintained [his] innocence about all the accusations she made against [him]."

C.    *Harris's Closing Argument*

Harris argued in his closing that if Angela's account of the February 28 assault were true, the blue napkins would have also had her DNA on them, but they did not. He also argued that he could not have committed multiple sex acts on Angela on the night of February 28 because he was exhausted from his trip to Texas and had injured himself a week earlier while attempting to move the treadmill, which was corroborated by his visits to the chiropractor and Detective Kong's testimony regarding his shoulder injury. Further, Angela and Lindsey provided conflicting testimony regarding their interaction during the assault that night.

Harris further argued the evidence showed that Angela did not call the rape hotline on the morning of March 1 because Harris took an Uber ride from the van rental location to the apartment that morning, which placed him at home at the time of the alleged call. Further, the prosecution presented no evidence that Angela made a call to the rape hotline. In addition, Angela testified that she called the rape hotline in the morning right before she called the police, "but that call [to the police] happened at night." Harris made other arguments regarding the inconsistency of the evidence (and lack of evidence) with respect to his alleged sexual assaults of Angela and Lindsey. Harris also argued Angela and Lindsey fabricated the alleged abuse after Angela had a "complete meltdown" in front of Lindsey on the evening of February 28 following Angela's decision not to go to Texas and Harris's refusal to give her the Dodge Dart she claimed she owned.

D.     *The Verdict and Sentencing*

The jury found Harris guilty with respect to Angela of one count of forcible rape (Pen. Code,[4] § 261, subd. (a)(2); count 1) and two counts of forcible sodomy (§ 286, subd. (c)(2)(A); counts 2 & 5). The jury found Harris guilty with respect to Lindsey of a lewd act upon a child under the age of 14 (§ 288, subd. (a); count 3) and continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a); count 4). The jury also found true as to all counts that Harris committed lewd acts against multiple victims within the meaning of the one strike law (§ 667.61, subd. (e)(4)), and that he

---

[4]     Further undesignated statutory references are to the Penal Code.

committed the prior offense of forcible oral copulation (of Crystal) (former § 288a, subd. (c)(2)).[5]

The trial court sentenced Harris to an aggregate sentence of 100 years to life in state prison comprising four consecutive sentences of 25 years to life on counts 1, 3, 4, and 5 imposed pursuant to the one strike law (§ 667.61, subds. (a) & (d)(1)). The court imposed a sentence of 25 years to life on count 2 but stayed the sentence under section 654. Harris timely appealed.

## DISCUSSION

A.    *The Trial Court Did Not Violate Harris's Right to Equal Protection by Denying His Requests for Transcripts*

1.    *Factual background*

At a pretrial hearing on February 6, 2024, Harris requested the transcripts and minute orders from the pretrial hearings held on January 18 and 23. The trial court denied Harris's request for the transcripts, explaining that daily transcripts were available only for capital cases, but it granted Harris's request for minute

---

[5]    The abstract of judgment incorrectly lists Harris's convictions on counts 4 and 5 as violations of section 288, subdivision (a), and section 288.5, subdivision (a), respectively. Harris was convicted on count 4 of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)) and on count 5 of sodomy by use of force (§ 286, subd. (c)(2)(A)). The superior court is directed to prepare an amended abstract of judgment that correctly identifies the convictions on counts 4 and 5 consistent with the verdict. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["the abstracts of judgment should be corrected to conform to the verdicts"].)

orders from those days.  At a hearing on February 22, Harris renewed his request for the January 18 transcript, arguing he needed the transcript because the prosecutor had stated in court on January 18 that the "metadata" on certain videos from the police bodycams disclosed in discovery was "wrong."  The prosecutor responded that the data was not incorrect; rather, the timestamps on the videos were stated in UTC time, which needed to be converted into local Pacific Standard Time.  Harris then requested a transcript from the February 22 hearing because he was "not able to write fast enough."

On February 28 Harris renewed his request for the January 18 transcript.  The trial court responded that there was a "dire" shortage of court reporters in the superior court, so "the court reporters are spread too thin to provide transcripts from routine pretrial conferences."  The court instead provided a "one paragraph rough draft of January 18 referencing the discussion on metadata," which the court stated confirmed the prosecutor never said the metadata was incorrect.  At the end of the hearing Harris requested transcripts for the pretrial hearings held on January 18 and 23 and February 6, 15, 22, and 28 in order "to submit an appeal."  The court denied the request, explaining, "There's nothing to appeal.  There's no final judgment in this case."  The court stated further, "The court does not find that a showing has been made of need for those routine pretrial conference transcripts for you to present a defense on your behalf in this matter."  However, the court agreed to provide Harris the transcript for January 18 given that there was some confusion about what was said at the hearing.

At the sentencing hearing on April 10, 2024, Harris filed a motion to vacate and to set aside the judgment (motion to vacate)

13

and a motion for transcripts. Harris sought transcripts for 13 pretrial hearings and the five days of trial. Harris submitted a declaration in which he stated he was indigent and had "repeatedly requested transcripts and been denied." Harris explained at the hearing that he needed the transcripts "to [have] a meaningful hearing regarding the motion to set aside judgment." Specifically, he needed the transcripts "to give meaning to some of the things that were in" his motion to vacate and "to cite page and line[s] of things that were said [at trial] that were problems for the trial."

The trial court stated it had reviewed Harris's motion to vacate and found that "each and every ground contained in this motion to set aside are identical [to] the issues that were previously adjudicated over and over and over by this court," including issues raised in "a motion to continue in the days leading up to trial" and a habeas petition Harris had filed during trial. The court noted the only new evidence raised in the motion was a "reference to a gentleman named Weldon McDavid," whom Harris had first mentioned in a series of questions during his cross-examination of Crystal.[6] The court explained that had Harris sought to admit testimony about McDavid in an Evidence Code section 402 motion (instead of just asking questions), the

_____

[6] During Harris's cross-examination of Crystal, Harris asked Crystal whether she had purchased a gun from McDavid, whether she had played the March 28, 2008 audio recording of the alleged assault for McDavid, whether Crystal had asked McDavid if the recording "sounds like rape," whether McDavid stated on television that he wanted to kill Harris, and whether McDavid was convicted of attempted murder. The court sustained the prosecutor's objections to Harris's questions on relevance grounds.

14

court would have excluded the testimony under Penal Code section 352. The court denied Harris's motion to vacate and did not further address the motion for transcripts, impliedly denying the motion.

### 2. *Governing law*

"[T]he State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." (*Britt v. North Carolina* (1971) 404 U.S. 226, 227 (*Britt*); accord, *People v. Reese* (2017) 2 Cal.5th 660, 663 (*Reese*) ["Both this court and the United States Supreme Court have long held that one such tool [for an adequate defense] is access to a transcript of prior proceedings."]; *People v. Hosner* (1975) 15 Cal.3d 60, 64 (*Hosner*).)

*Britt*, *Reese*, and *Hosner* held that an indigent defendant facing a retrial has a right to a free transcript of the first trial. (*Britt, supra*, 404 U.S. at p. 227; *Reese, supra*, 2 Cal.5th at p. 665; *Hosner, supra*, 15 Cal.3d at p. 66.) As the Supreme Court in *Reese* explained, "the federal Constitution's equal protection clause presumptively entitles an indigent defendant facing retrial to a complete transcript of his first trial." (*Reese*, at p. 666.) The appellate courts have not applied the presumption of entitlement to other requests for pretrial or trial transcripts. The California Supreme Court in *Reese* adopted the framework established in *Britt*, which "emphasized the importance of two factors that determine whether an indigent defendant's interest in obtaining

15

a transcript of prior proceedings is strong enough to entitle him or her to the transcript: (1) the value of the transcript to the defendant; and (2) the availability of alternative means that would fulfill the same functions as a transcript." (*Reese*, at p. 665; see *Britt*, at p. 227.)

In contexts other than an appeal or a retrial, an indigent defendant's need for transcripts must be determined on a case's "own peculiar facts and circumstances." (*People v. Lopez* (1969) 1 Cal.App.3d 78, 83 [affirming denial of trial transcripts to prepare motion for new trial, noting "no showing was made as to why the deputy public defender could not have assisted [new counsel] to prepare for the motion"]; accord, *People v. Markley* (2006) 138 Cal.App.4th 230, 241, 243 [affirming denial of request for witness testimony from 2002 trial for use in 2004 trial on different charges where counsel "did not articulate with any specificity how the transcript would have been helpful"]; *People v. Hayden* (1994) 22 Cal.App.4th 48, 55 [denying request for transcripts from separate trials of former codefendant because defendant failed to show why he needed transcript from codefendant's trial on different charge]; *People v. Bizieff* (1991) 226 Cal.App.3d 1689, 1704 [affirming denial of transcripts to support motion for new trial where defendant "failed to make an adequate showing of need" for transcript from first trial to prove ineffective assistance of counsel at second trial].)

3. *The trial court did not violate Harris's constitutional right to transcripts*

As discussed, on February 28, 2024 Harris requested transcripts for the pretrial hearings on January 18 and 23 and February 6, 15, 22, and 28. Harris argued he needed the

16

January 18 transcript to show the prosecutor had stated the metadata for the bodycam footage was incorrect.  Then, on April 10 Harris sought transcripts for 13 pretrial hearings (including those in his first request), stating he needed them for an appeal or to provide a "meaningful hearing" on his motion to vacate.  Harris concedes on appeal, however, that he was provided the January 18 transcript, and as to the other pretrial transcripts, he "did not affirmatively demonstrate a particularized need" for the transcripts.  The record is consistent with Harris's concessions:  He did not articulate specific reasons why he needed a transcript for any of the pretrial hearings except for January 18.

Harris instead contends he had a presumptive entitlement to the pretrial transcripts he requested under the reasoning in *Hosner, supra*, 15 Cal.3d at page 64 because the transcripts were necessary "in preparation for his defense at trial."  This contention fails.  As discussed, the Supreme Court in *Hosner*, and more recently in *Reese, supra*, 2 Cal.5th at page 665, held only that an indigent defendant *facing a retrial* is entitled to a complete trial transcript.  In other contexts, a defendant needs to make a particularized showing of his or her need for the requested transcripts.  (See *People v. Markley, supra*, 138 Cal.App.4th at p. 241; *People v. Bizieff, supra*, 226 Cal.App.3d at p. 1700; *People v. Lopez, supra*, 1 Cal.App.3d at p. 83.)

B.     *The Trial Court Did Not Abuse Its Discretion in Excluding Defense Exhibits I, J, and K, and the Testimony of Karin Harris*

1.     *Governing law and standard of review*

"Only relevant evidence is admissible." (*People v. Helzer* (2024) 15 Cal.5th 622, 667; see Evid. Code, § 350.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

"[H]earsay statements are generally inadmissible as evidence . . . ." (*People v. Jasso* (2025) 17 Cal.5th 646, 668; see Evid. Code, § 1200, subd. (b).) "'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Conversely, "[w]hen an out-of-court statement is offered for any relevant purpose other than to prove the truth of the matter stated, the statement is not hearsay." (*People v. Wilson* (2021) 11 Cal.5th 259, 305; accord, *People v. Armstrong* (2019) 6 Cal.5th 735, 785-786.) When considering whether an out-of-court statement is nonhearsay, "[t]he first, and most basic, requirement for applying the not-for-the-truth limitation . . . is that the out-of-court statement must be offered for some purpose independent of the truth of the matters it asserts. That means that the statement must be capable of serving its nonhearsay purpose regardless of whether the jury believes the matters asserted to be true." (*People v. Hopson* (2017) 3 Cal.5th 424, 432]; accord, *Hart v.*

18

*Keenan Properties, Inc.* (2020) 9 Cal.5th 442, 447; *Armstrong,* at p. 786.)

Even if evidence is otherwise admissible, the trial court has discretion to exclude it under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [trial court did not abuse its discretion under Evid. Code, § 352 by excluding evidence with limited probative value where presentation would result in time-consuming "'mini-trial'" on collateral issues]; *People v. Holford* (2012) 203 Cal.App.4th 155, 178, fn. 14 [evidence "*may* have a lower probative value if it is merely cumulative of other evidence [citations] and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time"].)

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. (*People v. Helzer, supra*, 15 Cal.5th at p. 667; see *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.) "'[T]he trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value.'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87.) "'[W]e will not disturb the trial court's ruling "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Briley v. City of West Covina* (2021) 66 Cal.App.5th 119, 132; accord, *People v. Miles* (2020) 9 Cal.5th 513, 587-588.) The appellant has the burden to establish an

19

abuse of discretion.  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281; accord, *People v. Woodward* (2025) 116 Cal.App.5th 379, 399.)

> 2.  *The trial court did not abuse its discretion*
>     a. *The photographs* (*exhibit I*)

As discussed, the trial court excluded 15 undated photographs (marked as exhibit I) that Harris described as "taken during the relationship in the time period in question." The exhibit included six photographs of a Christmas tree adorned with varying holiday decorations, three photographs of Lindsey, and six photographs of Harris with Angela or Lindsey (or both) in which the three generally appeared happy.  Harris offered that one of the photographs depicted a "birthday tree," which rebutted Angela's testimony that birthdays were never celebrated in their apartment.  The court found the photographs were not relevant and Harris's offer of proof misstated Angela's testimony and sought to impeach a witness on a collateral matter.

Harris contends the 15 photographs were relevant to show that Harris's relationship with Angela and Lindsey was a "happy one," which was "directly contrary to the picture painted of him as a resident sexual abuser who [Angela] was anxious to have move away."  However, Harris did not present any evidence that the photographs were taken around the time the alleged sexual abuse took place other than his vague statement that the photographs occurred during "the time period in question."  Even if he had made this showing, evidence that Harris, Angela, and Lindsey appeared to experience discrete happy moments together does not tend to disprove that Harris committed sex offenses

20

against Angela and Lindsey from November 2016 to February 2021.

  b. *The Joint Chiropractic email (exhibit J)*

The trial court also excluded as hearsay a February 21, 2021 email from The Joint Chiropractic confirming that Harris had joined the chiropractic club (Exhibit J).  Harris mentioned in his opening statement and closing argument that he had joined the chiropractic club on February 21, arguing it was proof that he had injured himself by moving the treadmill.  He also argued that given his injury, he was not capable of committing the sexual assaults.

The trial court did not abuse its discretion in excluding the email as hearsay:  The email was an out-of-court statement offered for the truth of the statement—that Harris bought a "membership to the Joint Chiropractic."[7]  Moreover, the email did not tend to prove, as argued by Harris, that he was injured or visited the chiropractor on that date; rather, the email stated only that he had joined the club.

  c. *The March 1, 2021 Uber receipt (exhibit K)*

Harris marked as exhibit K an email from "Uber Receipts" dated March 1, 2021 (Uber receipt) that stated, "Thanks for riding, Shawn," and listed an 8:22 a.m. pick up in Lomita, California and an 8:39 a.m. drop off at the Long Beach

---

[7]  We note that the business records exception in Evidence Code section 1271 did not apply because Harris did not offer a "custodian or other qualified witness" who could "testif[y] to [the email's] identity and the mode of its preparation," as required by subsection (c).

apartment. Harris asserted in his opening statement and closing argument that the receipt placed him at the Long Beach apartment at 8:40 a.m. on March 1, which showed that Angela's account of calling the rape hotline early that morning was false because he would have been present for the call. The prosecutor objected to admission of the receipt as hearsay, and the trial court sustained the objection.

Harris contends on appeal that the trial court abused its discretion because the receipt is a computer-generated document and thus falls within an exception to the hearsay rule. (See *People v. Nazary* (2010) 191 Cal.App.4th 727, 732, 754 (*Nazary*), overruled on other grounds in *People v. Vidana* (2016) 1 Cal.5th 632, 648 [receipts printed by "Pay Island Cashiers" (PIC) machines at gas pumps reflecting amount of cash received at pump were admissible as computer-generated receipts printed by PIC machines]; *People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1446, 1450 (*Hawkins*) [computer printout of times when defendant's computer was accessed was not hearsay because a computer printout is presumed to be accurate under Evid. Code, § 1552].)[8]

---

[8] Evidence Code section 1552, subdivision (a), provides, "A printed representation of computer information or a computer program is presumed to be an accurate representation of the computer information or computer program that it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of computer information or computer program is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the

22

As the Court of Appeal explained in *Nazary*, "The printed portions of the PIC receipts, including the date, time, and totals, were not statements inputted by a person, but were generated by the PIC machine. 'The essence of the hearsay rule is a requirement that testimonial assertions shall be subjected to the test of cross-examination. [Citation.] . . . Under no possible scenario could the PIC machines have been cross-examined. Rather the witnesses who explained the data printed on the PIC receipts . . . could have been, and were." (*Nazary*, *supra*, 191 Cal.App.4th at pp. 754-755.)

The challenge for Harris is that he presented no witness testimony or other evidence that the rideshare company uses a computer to automatically generate a receipt of rides with a timestamp that reflects the correct local time, and that the company sends the receipt to an email associated with the customer's account containing the results of that computer printout. Harris presented only the email from "Uber Receipts" to an email address with the name "shawnharris" as part of the address. By contrast, in *Nazary* there was extensive testimony about how the PIC machines generated a receipt reflecting the amount of cash deposited each day. (*Nazary, supra*, 191 Cal.App.4th at p. 732; see *Hawkins*, supra, 98 Cal.App.4th at pp. 1447-1448 [computer expert testified about the computer file access times found on defendant's computer].)

---

existence and content of the computer information or computer program that it purports to represent."

Even if the Uber receipt falls within the computer-generated document exception to the hearsay rule, any error in excluding the receipt was harmless.  Harris has not shown under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) it was reasonably probable that had the trial court admitted the Uber receipt, Harris would have had a more favorable result.  (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308 [abuse of discretion in admitting hearsay evidence is reviewable for harmless error under *Watson*]; *People v. Homick* (2012) 55 Cal.4th 816, 872 [same].)

Harris argued that the Uber receipt disproved Angela's account that when she called the rape hotline early on the morning of March 1, Harris was not in the apartment.  The receipt supported Harris's contention that he was in the Long Beach apartment at 8:39 a.m. on the morning of March 1.  But Angela did not provide a precise time for when she called the rape hotline, testifying only that she called the rape hotline that morning.  Thus, the receipt did not show that Angela was lying about the time of her call to the rape hotline.  Rather, she could have called the hotline prior to 8:39 a.m. or later that morning.

Further, as discussed, Angela and Lindsey provided detailed accounts of the sexual assaults; the results from the SART examination of Angela showed vaginal abrasions and anal lacerations that were consistent with the sexual assaults; and Crystal provided a detailed account of a similar sexual assault Harris had previously committed.  It is not reasonably probable the jury would have discounted this evidence based on evidence that Harris returned to the apartment at 8:39 a.m. on the morning of March 1.

24

d. *Exclusion of Karin Harris's testimony about the car*

At a hearing outside the presence of the jury, Harris requested the court allow his mother, Karin Harris (Karin), to testify about an occasion in August 2022 when Angela and her former boyfriend Raymond Barlow went to Karin's house and demanded Karin give them the Dodge Dart after they had "fraudulently lien-saled" the car, sending a notice of the sale of the car even though Harris owned the car and Angela and Barlow knew he was in custody. Harris argued the testimony was relevant because his argument with Angela about the car led to Angela's false allegations. Harris explained Karin would testify that Angela and Barlow continued to go to Karin's house to demand the car, leading Karin to seek a restraining order against them based on elder abuse.

Harris submitted an October 20, 2022 minute order from Karin's elder abuse action against Angela and Barlow. The minute order stated with respect to Karin's request for a restraining order against Angela and Barlow that she "has not met the burden of proof that is required." The minute order further stated "this court cannot determine who the vehicle in question belongs to."

The trial court observed that the minute order was issued more than 18 months after the alleged February 28 assault, and the order involved "a court in a different county . . . [that] was unable to determine to whom the car belong[ed]," which was "absolutely not relevant to this case." Further, Karin's testimony concerned a collateral matter (the car) that was "far afield" and would result in "a trial within a trial on what happened with regard to [the Dodge Dart] a significant period of time after the

25

last allegation." The court excluded Karin's testimony based on lack of relevance and Evidence Code section 352.

Harris contends the trial court abused its discretion in excluding Karin's testimony because the litigation over ownership of the car was central to Harris's defense that Angela fabricated her sexual assault allegations after Harris refused to relinquish the car to her. Further, Karin's testimony would not consume excessive time because it did not matter who owned the car, but rather, that there was a dispute about ownership. The trial court did not abuse its discretion. Karin's testimony about Angela's efforts to obtain the car after February 28 could have provided some support for Harris's theory that Angela fabricated the sexual assault to obtain the return of the car. However, as the trial court observed, Karin's testimony had minimal probative value because the events she would describe occurred 18 months after the alleged sexual assault on February 28. Moreover, the superior court in the elder abuse action denied Karin's request for a restraining order and stated it did not have sufficient information to determine ownership of the car. Thus, this evidence could create confusion over how a court ruling that denied any relief to Karin on her claims of abuse and theft of the car was relevant to whether Harris had sexually abused Angela and Lindsey.

Further, the trial court did not abuse its discretion in finding that Karin's testimony would result in a mini-trial on the collateral issues of Karin's efforts in 2022 to obtain a restraining order against Angela and the dispute over ownership of the Dodge Dart. Although Harris argued the jury did not need to determine who was the rightful owner of the car, Angela would

26

have the right to rebut Karin's allegations, resulting in the very mini-trial that Harris claims would not occur.[9]

C.  *The Trial Court Did Not Err in Instructing the Jury with CALCRIM No. 226*

After the prosecutor and Harris presented their closing arguments, the trial court instructed the jury.  Harris contends the court committed prejudicial error in its instruction of the jury with CALCRIM No. 226 on the credibility of witnesses.  The court instructed the jury that "[i]n evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.  Among the factors that you may consider are," and then the court listed 10 factors from the pattern CALCRIM No. 226 instruction.  Harris contends the court erred in omitting one of the factors in the pattern instruction:  "Did other evidence prove or disprove any fact about which the witness testified?"  Any error in failing to instruct the jury on this factor was harmless.

---

[9]    Because we conclude the trial court did not abuse its discretion in excluding exhibits I, J, and K and Karin's testimony, the court did not violate Harris's constitutional right to due process or his right to present a defense.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 728 ["As '"a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense."'"]; *In re L.J.* (2023) 89 Cal.App.5th 741, 754 ["'The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court.'"]; see *People v. Chhoun* (2021) 11 Cal.5th 1, 45 ["'"[A] defendant does not have a constitutional right to the admission of unreliable hearsay statements."'"].)

27

1. *Governing law and standard of review*

"A trial court has a sua sponte duty to 'instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case,' including instructions relevant to evaluating the credibility of witnesses." (*People v. Blacksher* (2011) 52 Cal.4th 769, 845-846; accord, *People v. Mitchell* (2019) 7 Cal.5th 561, 586.) "'[T]he court should give the substance of CALJIC No. 2.20 [now CALCRIM No. 226] in every criminal case, although it may omit factors that are inapplicable under the evidence.'" (*Mitchell*, at p. 586; accord, *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883; see Evid. Code, § 780 [setting forth factors a jury may consider in deciding the truthfulness of witness testimony].)

We review a claim of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 382; accord, *People v. Lewis* (2023) 14 Cal.5th 876, 900.) "'In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner."'" (*Lewis*, at p. 900; accord, *Thomas*, at p. 382.) Further, "[i]nstructions should be interpreted, if possible, to support the judgment, rather than defeat it, if they are reasonably susceptible to such interpretation." (*People v. Parker* (2025) 113 Cal.App.5th 1261, 1271; see *People v. Morales* (2021) 69 Cal.App.5th 978, 994.)

28

2. *The trial court did not commit prejudicial error*

Harris contends the court should have instructed the jury on whether there was other evidence that "prove[d] or disprove[d] any fact about which the witness testified" because there was evidence, including his testimony, that contradicted the accounts given by Angela and Lindsey. We agree the court should have instructed the jury on this factor in light of the conflicting testimony. (*People v. Mitchell, supra*, 7 Cal.5th at p. 586; *People v. Rincon-Pineda, supra*, 14 Cal.3d at p. 883.) However, the error was harmless.

Harris argues he was prejudiced because the jury, after being instructed that the 10 enumerated factors were "'[a]mong the factors that you may consider,'" may have "assume[d] that the factors which the court enumerated were an exclusive list." That is not a fair reading of the instruction, which told the jurors the opposite—that they may "consider anything that reasonably tends to prove or disprove the truth or accuracy" of a witness's testimony, including factors other than the 10 the court listed. Moreover, it is not a reasonable assumption that the jury would have entirely disregarded Harris's testimony (and other conflicting evidence) given the absence of an instruction specifically directing the jurors that they may consider evidence that disproved the testimony of Angela and Lindsey. Accordingly, it is not reasonably probable that had the court instructed the jury on this factor, there would have been a more favorable outcome for Harris. (See *People v. Murillo* (1996) 47 Cal.App.4th 1104, 1107-1108 [*Watson* harmless error standard applied to trial court's error in failing to instruct the jury regarding evaluation of testimony of witness who provides willfully false testimony]; *People v. Galloway* (1979)

29

100 Cal.App.3d 551, 567-568 [error in omission of factor on inconsistent witness statement from predecessor to CALCRIM No. 226 was harmless under *Watson* standard].)

## DISPOSITION

The judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment that reflects Harris's conviction on count 4 of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)) and on count 5 of sodomy by use of force (§ 286, subd. (c)(2)(A)).  The clerk of the superior court is ordered to forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.


FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.

30